**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Colleen NERO, Defendant-Appellant.**

**No. 83–2095.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1983.

Decided April 25, 1984.

Frank J. Schiro, Salza & Schiro, Ltd., Milwaukee, Wis., for defendant-appellant.

Mel S. Johnson, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before POSNER, COFFEY and FLAUM, Circuit Judges.

COFFEY, Circuit Judge. ·

The defendant-appellant, Colleen Nero, was convicted of two counts of interstate transportation of forged securities (traveler's checks) in violation of 18 U.S.C. section 2314. On April 18, 1983, following the entry of judgment of conviction, the defendant filed a motion for a new trial on the basis of newly discovered evidence pursuant to Rule 33, Federal Rules of Criminal Procedure. The district court issued a written decision on May 27, 1983, denying the defendant's motion for a new trial. The defendant appeals the denial of her motion for a new trial.

The issues on appeal are whether a new trial should have been granted on the basis of newly discovered evidence and whether the defendant was provided with effective assistance of counsel. For the reasons indicated below, we find that the district court did not abuse its discretion in denying the defendant's motion for a new trial and that the ineffective assistance of counsel issue is not properly before this court. We affirm.

Briefly summarized, the record indicates that on October 26, 1982, the defendant was indicted on two counts of interstate transportation of forged traveler's checks. The government's theory of the case was that the traveler's checks had been stolen by the defendant from Dorner's World of Travel, Inc. in Green Bay, Wisconsin during her employment there. Count I of the indictment alleged that the defendant used seven individually identified American Express traveler's checks, which were the property of Dorner's, to purchase roundtrip airfare between Chicago and Las Vegas over the weekend of September 12–14, 1981. Count II alleged that six other American Express traveler's checks were used by the defendant in Las Vegas during that same weekend. On January 13–14, 1983, the case proceeded to a jury trial.

Certain facts and exhibits were received in evidence without dispute, including the facts that: the defendant worked for Dorner's at the time the checks were stolen; as an employee the defendant had access to

the vault from which the checks were stolen; the traveler's checks used in Chicago on September 12, 1981, to purchase round-trip airline tickets from Chicago to Las Vegas, and those used to make various purchases in Las Vegas, were all cashed by a person using the name "Debra Trinkle"; and the defendant's fingerprints were found on some of the traveler's checks in question.

The government's first witness was Charlie Raether, president of Dorner's. Mr. Raether testified that the defendant, as an outside group sales manager at Dorner's, would not ordinarily handle traveler's checks. He further stated that the defendant was absent from work on September 14, 1981, and that he recalled receiving a telephone call from her on that date during which she stated that she was ill and would not report for work on that date, but did not mention that she was in Las Vegas.

Melinda Fitzgerald Kidd, another government witness, was the controller at Dorner's. She testified to the procedures used at Dorner's to avoid having any employee actually touch any traveler's checks. Ms. Kidd's record revealed that the defendant never sold traveler's checks for Dorner's as that was not a part of her duties. On the basis of the audit procedures utilized at Dorner's, Ms. Kidd identified the traveler's checks in question as being among those found missing from the vault in September of 1981.

The government also called Fred Boyd, Wisconsin Station Operations Manager at United Airlines. Mr. Boyd identified seven traveler's checks issued to a "Debra Trinkle" as being those used to purchase a roundtrip ticket between Chicago and Las Vegas, departing on September 12, 1981, and returning on September 14, 1981. Mr. Boyd also testified that United Airlines' records reflected that the original return flight was scheduled to depart from Las Vegas at 1:40 p.m. on September 14, but was re-scheduled to a later flight, departing at 4:00 p.m. on the same date.

FBI Agent Dixie Lee Vaughn, another government witness, testified that the defendant asserted in a statement taken from her in May 1982, that she did not handle traveler's checks for Dorner's and had no access to them.

The defendant's estranged husband, Dean Nero, testified that in September of 1981, he drove the defendant from their home in Green Bay to O'Hare Field in Chicago, to enable her to catch her flight to Las Vegas where she intended to arrange a sale of their townhouses located there. Mr. Nero recalled receiving a phone call from his wife on September 14, 1981, informing him that the real estate closing would be delayed and that she would be taking a later flight. On cross-examination, Mr. Nero stated that he believed he had driven his wife to Chicago for the flight to Las Vegas because the Green Bay airport was fogged in. He could not remember whether he had made a similar trip with the defendant in August of 1981, when she flew to Alaska. Finally, Mr. Nero recalled that one of the tenants in their Las Vegas townhouses was named Debra Trinkle.

William Janson, the individual who bought the Las Vegas townhouses from the defendant on September 14, 1981, and who also happened to be an FBI agent, corroborated Mr. Nero's testimony. Mr. Janson testified that he received a call from the defendant on September 12, 1981, informing him that she had just arrived in Las Vegas. On the next day, Mr. Janson met the defendant to inspect the townhouse and, in a passing conversation, the defendant stated that her husband had driven her from Green Bay to Chicago and that she had flown on United Airlines from Chicago to Las Vegas. Mr. Janson also testified that on September 14, he met the defendant at 2:00 p.m. for the real estate closing, at which time he observed the defendant call her husband and heard her tell him that the real estate closing had been delayed and that she would be taking the 4:00 p.m. flight from Las Vegas.

Debra Trinkle Lawrence testified that she was a tenant in one of the Nero's Las Vegas townhouses from April 1 through August 30, 1981. Ms. Trinkle stated that she had moved to Arizona in September of 1981, had not been in Las Vegas during that time, and did not cash any traveler's checks in Las Vegas during the time in question. Ms. Trinkle reviewed the traveler's checks bearing the endorsement of "Debra Trinkle" and testified that the endorsements were not in her handwriting.

·FBI Investigating Agent, John Thomas Aziere, testified that he discussed the case with the defendant and her trial counsel and took statements from her on December 22 and 30, 1981, and again on December 2, 1982. According to Mr. Aziere, the defendant originally denied that she was in Las Vegas in September of 1981, but after he confronted her with information showing that she had been at the real estate closing, she admitted her presence in Las Vegas from September 12 to 14, 1981. According to Mr. Aziere, the defendant also told him that she had flown to Las Vegas on a friend's airline pass, but refused to reveal the name of the friend.

The defendant testified on her own behalf. She denied ever taking any traveler's checks from Dorner's, or ever forging any such checks. The defendant denied flying to Las Vegas via United Airlines, and denied paying for her ticket with the traveler's checks. She claims she flew to Las Vegas from Milwaukee on Republic Airlines using an airline pass provided by Republic Airlines. The defendant testified that her husband drove her from Green Bay to Milwaukee for her September flight to Las Vegas. She further testified that in August of 1981, her husband had driven her from Green Bay to Chicago to allow her to fly to Alaska.

The defendant also questioned the credibility of her husband and the three FBI agents who had testified for the government. She believed Agent Aziere misinterpreted her answers since she only denied traveling to Las Vegas via United Airlines, that Agent Vaughn was simply mixed up about her answers, and that Agent Janson was wrong in his testimony. The defendant admitted knowing Debra Trinkle, but stated she only knew her as "Debra Stevens" when she was a tenant in Las Vegas. The defendant testified that she had handled traveler's checks on various occasions while an employee at Dorner's. Finally, the defendant admitted calling Mr. Raether on September 14, 1981, and telling him she could not come into work that day because she was sick.

On January 14, 1983, the jury returned a verdict of guilty on both counts. Between the time of conviction and sentencing, the defendant replaced her trial attorney with new counsel, Mr. Frank Schiro. After sentencing, the defendant's counsel filed a motion for new trial based on newly discovered evidence. That motion did not allege ineffective assistance of counsel on the part of the defendant's trial lawyer.

The newly discovered evidence on which the defendant based her motion for a new trial consists of a February 12, 1983, letter purportedly signed by Dean Nero, recanting his trial testimony; a letter postmarked January 20, 1983, also purportedly signed by Dean Nero to Green Bay airport's Weather Service Office which inquires as to whether the airport was fogged in on September 12, 1981; weather reports from the National Weather Service which allegedly show that the Green Bay Airport was not fogged in on September 12, 1981; a March 9, 1983, letter from the defendant to the president of Republic Airlines reflecting her difficulty in obtaining flight documentation from Republic Airlines for the September 12, 1981, flight to Las Vegas; a June 19, 1981, letter from Charles Raether, president of Dorner's, to the defendant indicating that her job duties did in fact include servicing walk-in customers and the overall functions of a travel agent (providing a possible reason for the defendant's fingerprints on the traveler's checks in question); an April 18, 1983, letter from Ford Aerospace and Communications Corporation to the defendant confirming her security clearance; and a letter from Capi-

tol Preservation Fund Incorporated enclosing a draft which allegedly demonstrates that the defendant purchased an August, 1981, airline ticket to Alaska.

Judge Warren denied the defendant's motion for a new trial on May 27, 1983, based on the standards enunciated in *U.S. v. Oliver*, 683 F.2d 224 (7th Cir.1982) and *Larrison v. U.S.*, 24 F.2d 82 (7th Cir.1928). The defendant appeals, claiming the district court erred in failing to grant a new trial, and additionally alleges that her trial attorney did not provide her with effective assistance of counsel.

## STANDARDS FOR NEW TRIAL BASED UPON NEWLY DISCOVERED EVIDENCE

The elements which must be established for a new trial on the basis of newly discovered evidence have been clearly articulated by this court:

> "The defendant must show that the evidence (1) came to their knowledge only after trial; (2) could not have been discovered sooner had defendants exercised due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial."

*U.S. v. Oliver*, 683 F.2d 224, 228 (7th Cir. 1982), (*citing U.S. v. Hedman*, 655 F.2d 813, 814 (7th Cir.1981) and *U.S. v. Pappas*, 602 F.2d 131, 133 (7th Cir.), *cert. denied*, 444 U.S. 949, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979)).

In the more specific situation where the newly discovered evidence allegedly demonstrates that there was false testimony at trial, or that a government witness has recanted, this court has articulated slightly different requirements. In *Larrison v. U.S.*, 24 F.2d 82 (7th Cir.1928), our court held that in such a situation three requirements must be satisfied before a new trial will be granted:

> "(a) The court is reasonably well satisfied that the testimony given by a material witness is false.
>
> (b) That the jury *might* have reached a different conclusion.
>
> (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial."

*Id.* at 87–88.[1]

■ The standard of appellate review of a district court's disposition of a motion for a new trial is well established in this court. It is within the sound discretion of the district court to decide whether a new trial should be granted on the basis of newly discovered evidence. Thus, on review our inquiry is whether the discretion granted to the district court has been abused. *U.S. v. Davis*, 604 F.2d 474, 483 (7th Cir.1979). The heavy burden placed upon the appellant in this motion was noted by the court in *Davis*:

> "The party who claims that the trial court erred in denying his motion for a new trial is not likely to be successful. The appellate court properly defers to the view of the trial court, and will affirm unless there has been an error as a matter of law or a clear and manifest abuse of judicial discretion."

*Id.* at 484, (quoting 2 C. Wright, Federal Practice and Procedure, § 559 at 541–42 (1969)).

## NEWLY DISCOVERED EVIDENCE UNDER THE *LARRISON* RULE

On appeal, the defendant alleges that three items of newly discovered evidence satisfy the requirements under *Larrison v. United States*, 24 F.2d 82 (7th Cir.1928), and thus mandate the granting of a new trial. That evidence consists of the February 12, 1983, letter to Judge Warren signed

---

1. *See also U.S. v. Jarrett*, 705 F.2d 198, 206 (7th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984); *U.S. v. Gabriel*, 597 F.2d 95, 98 (7th Cir.), *cert. denied*, 444 U.S. 858, 100 S.Ct. 120, 62 L.Ed.2d 78 (1979), *U.S. v. Robinson*, 585 F.2d 274, 277 (7th Cir.1978), *cert.* denied, 441 U.S. 947, 99 S.Ct. 2171, 60 L.Ed.2d 1051 (1979) and *U.S. v. Becker*, 466 F.2d 886, 889 (7th Cir.1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 910, 34 L.Ed.2d 689 (1973), for recent decisions in which the Seventh Circuit has utilized the *Larrison* standard.

with the name "Dean Nero" expressing uncertainty about the accuracy of his testimony at trial; [2] a letter postmarked January 20, 1983, to the Weather Service in Green Bay, Wisconsin, again signed with the name "Dean Nero" inquiring about weather conditions in Green Bay on August 14 and September 12, 1981; [3] and reports from the National Weather Service in Green Bay concerning the weather conditions in Green Bay on August 14 and September 12, 1981. We hold that none of these items of evidence, when considered either separately or collectively, satisfy the requirements enunciated in *Larrison* to justify a new trial.

▪ The February 12, 1983, letter allegedly sent by Dean Nero to Judge Warren fails to satisfy the *Larrison* requirements. Due to the doubtful authenticity of the letter itself, the presence of other evidence corroborating Dean Nero's testimony, and the fact that Dean Nero's statement to the FBI was made available to the defendant prior to trial, this court is not "reasonably well satisfied" that Dean Nero's testimony is false, that the introduction of the letter might cause a jury to reach a different conclusion, or that the defendant was surprised by Dean Nero's testimony.

Although the February 12 letter is signed in the name of "Dean Nero", the defendant has offered no proof of its authenticity. On the contrary, the government has submitted the affidavit of FBI Special Agent Charles B. Kearney, who interviewed Dean Nero on February 23, 1983, regarding the February 12 letter. In that interview, Dean Nero flatly denied that he ever wrote a letter to Judge Warren recanting his testimony, and further stated that his testimony at trial was accurate. Accordingly, this court is far from satisfied that Dean Nero's testimony at trial was false.

The additional evidence corroborating Dean Nero's testimony further supports our holding that the introduction of the February 12 letter at a retrial would not cause a jury to reach a different determination. Mr. Nero testified that he drove the defendant from Green Bay to O'Hare Field in Chicago on September 12, 1981, to enable her to fly to Las Vegas to sell certain townhouses they owned to William Janson. Mr. Nero also testified that he received a call from the defendant on September 14, 1981, in which she stated that the real estate closing was delayed and that she would be flying back on a later flight. Such testimony is convincingly corroborated by the records of United Airlines and the testimony of William Janson. Mr. Janson testified that he met the defendant during the weekend of September 12–14 while purchasing the townhouses from her, and that in a passing conversation the defendant mentioned that she had flown on United Airlines from Chicago to Las Vegas. Mr. Janson also testified that he observed and heard the defendant call her husband on September 14, 1981, informing

---

2. The February 12, 1983, letter, allegedly written by Dean Nero, provides in relevant part:

   "Dear Judge Warren:
   I am writing to tell you that I have since found out and did not remember which time I took Colleen Nero to the Chicago Airport. I thought I remembered taking here [sic] there when she went to Las vegas [sic] in September, but after checking the reports I said I would tell the truth. I just dont [sic] want anyone to think I had anything to do with this mess. I guess I must have taken her there in Augusts [sic] as it was fogged in at the Green Bay Airport that day and she made me drive her all the way to Chicago so she could get her kids. I dont [sic] want to be charged with purjury [sic] or taking the checks because I

didnt [sic] have nothing [sic] to do with any of this.
   Sincerely,
   Dean Nero."

3. The letter postmarked January 20, 1983, allegedly written by Dean Nero provides in relevant part:

   "Gentlemen:
   Would you please verify something for me? This is important. I have to testify in court on a matter relating to this. Was the airport fogged in, and shutdown on the morning of September 12, 1981 or August 14, 1981. [sic] Please answer as soon as possible. Thank you very much.
   Sincerely,
   Dean Nero."

him that due to the real estate closing she would be taking a later flight. Furthermore, the United Airlines' records indicate that the traveler's checks in Count I of the indictment were used to purchase a round-trip ticket departing from Chicago on September 12, and returning from Las Vegas on September 14 at 1:40 p.m., and that the return reservation was changed to a flight later that same afternoon.

The February 12 letter also fails to meet the third requirement of *Larrison* since the defendant could not have been surprised by Dean Nero's testimony. Mr. Nero's statement to the FBI was included in the discovery material provided to defense counsel on November 8, 1982, over two months prior to the trial. Since his statement to the FBI was consistent with his trial testimony concerning his trip to Chicago with his wife, the defendant was on notice that Dean Nero would testify in a manner which the defendant has consistently maintained was false.

The complete lack of evidence regarding the authenticity of the February 12 letter, Mr. Nero's flat denial that he ever wrote the letter, and the substantial evidence corroborating Dean Nero's testimony, demonstrate that the introduction of the letter at a new trial would have little or no probative value regarding Dean Nero's credibility. Furthermore, this court does not believe that the letter might cause a jury to reach a different result and fails to see how Dean Nero's testimony took the defendant by surprise. Thus, the February 12 letter does not satisfy any of the *Larrison* requirements for a new trial.

■ The other "newly discovered" evidence allegedly requiring a new trial also fails to meet the three *Larrison* criteria. The defendant alleges that the January 20 letter and the weather reports demonstrate that Mr. Nero confused a trip which he made with the defendant in August with a trip he made with her in September of 1981. Mr. Nero testified on cross-examination that he drove the defendant to O'Hare Airport in Chicago, presumably on September 12, because the Green Bay Airport was fogged in. The defendant alleges that the weather reports indicate that the airport was fogged in on August 14, and not September 12, and that the January 20 letter indicates that Mr. Nero was unsure of the weather conditions at the Green Bay Airport on those dates. Neither item of evidence supports a grant of new trial under *Larrison*.

The weather reports referred to consist merely of rows of numbers which without expert clarification or explanation are incomprehensible. The defendant has failed to provide such expert clarification, explanation or interpretation. Even assuming that the reports indicate that the Green Bay Airport was fogged in on August 14, rather than September 12, such evidence only impeaches Dean Nero's testimony on a collateral issue, an item of evidence not relied upon by the government. We hold that the introduction of such evidence is not of the type which might cause a jury to reach a different conclusion and fail to understand how the defendant can believe it to be so. Furthermore, we believe that had the defendant acted with due diligence, the reports could have been obtained prior to trial in order to impeach Dean Nero's testimony.

The January 20 letter also fails to support the defendant's motion for a new trial under *Larrison*. An initial problem with this letter—allegedly written by Dean Nero to the Weather Service requesting information regarding the weather conditions at the Green Bay Airport on August 14 and September 12, 1981,—is that it is postmarked six days after the close of the trial. This fact alone raises serious questions as to its authenticity. Even assuming that Dean Nero wrote it, the letter at best merely impeaches his testimony on a collateral issue not relied upon by the government in its case. Accordingly, we do not believe that its admission in a new trial might cause the jury to reach a different conclusion.

We agree with the district court's ruling and hold that the district court properly exercised its discretion in denying the de-

fendant's motion for a new trial on the basis of newly discovered evidence under the criteria enunciated in *Larrison*. The January 20 and February 12 letters and the weather reports fail to satisfy the *Larrison* criteria, and thus a new trial was not warranted.

## NEWLY DISCOVERED EVIDENCE UNDER *OLIVER*

The defendant also alleges that four items of newly discovered evidence require a new trial under *U.S. v. Oliver*, 683 F.2d 224 (7th Cir.1982). That evidence consists of a March 9 letter from the defendant to the president of Republic Airlines reflecting her difficulty in obtaining flight documentation from Republic Airlines regarding her flight to Las Vegas on September 12, 1981; a letter from Capitol Preservation Fund Incorporated to the defendant providing her with a copy of a draft paid to Dorner's which allegedly verifies the payment of her airfare for her flight to Alaska in August of 1981; a letter from her previous employer confirming her security clearance; and a letter from the president of Dorner's summarizing the defendant's job duties. We hold that this evidence does not satisfy the *Oliver* criteria.[4]

■ The March 9 letter to Republic Airlines seeking verification of the defendant's trip to Las Vegas on September 12 fails to meet two of the requirements delineated in *Oliver*. The defendant was in possession of all the government's investigative reports more than two months prior to trial. Those reports revealed the government's intention to prove that on September 12, 1981, the defendant was driven from Green Bay to Chicago where she departed on a United Airlines flight to Las Vegas. Accordingly, the defendant was put on notice of the government's theory of the case; had the defendant exercised due diligence, she could have obtained any existing verification from Republic Airlines to either contradict or impeach the government's theory. The defendant's lack of due diligence is supported by the fact that the verification records were not subpoenaed, nor was a continuance sought to provide time to obtain those records.

■ Additionally, the March 9 letter represents nothing less than the defendant's third version of the events surrounding her trip to Las Vegas.[5] Given the defendant's changing testimony throughout the history of this case, we hold that it is not probable that the introduction of the March 9 letter would lead to an acquittal in the event of a new trial. Clearly, the likelihood that the newly discovered evidence would change the jury's decision must rise considerably above the level of sheer speculation in order to justify a new trial. *U.S. v. Riley*, 544 F.2d 237, 241 (5th Cir.1976), *cert. denied*, 430 U.S. 932, 97 S.Ct. 1554, 51 L.Ed.2d 777 (1977).

■ The letter from Capitol Preservation Fund Incorporated, allegedly verifying payment by the defendant for her airfare to Alaska, fails to meet three of the *Oliver* criteria. First, there is no explanation in the record why the letter could not have been obtained prior to trial had the defendant exercised due diligence. Although the letter reveals that drafts are not ordinarily returned, the defendant has not even at-

---

**4.** As previously noted, this court has established the elements which must be demonstrated to obtain a new trial on the basis of newly discovered evidence:

"The defendant must show that the evidence (1) came to their knowledge only after trial; (2) could not have been discovered sooner had defendants exercised due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial."

*U.S. v. Oliver*, 683 F.2d 224, 228 (7th Cir.1982), (*citing U.S. v. Hedman*, 655 F.2d 813, 814 (7th Cir.1981) and *U.S. v. Pappas*, 602 F.2d 131, 133

(7th Cir.), *cert. denied*, 444 U.S. 949, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979)).

**5.** The defendant's version of the events surrounding the Las Vegas trip have vascillated from a flat denial that she was in Las Vegas on the weekend of September 12, to testimony at trial that she flew on Republic Airlines from Milwaukee to Las Vegas via a pass she received in Green Bay, to the final version suggested in the March 9 letter that she flew from Green Bay to Milwaukee and then to Las Vegas on previously issued tickets.

tempted to allege, much less substantiate with evidence, that such information could not have been obtained prior to trial. Second, the evidence only corroborates the defendant's previous testimony regarding her trip to Alaska in August of 1981, and thus is merely cumulative. Third, because the evidence only relates to a peripheral issue which is not in dispute, it is not probable that the introduction of such evidence would lead to an acquittal in the event of retrial.

■ The letter from Ford Aerospace and Communications Corporation which verifies the defendant's security clearance while she was an employee there, also fails to satisfy the same three *Oliver* criteria. The security verification could have been obtained prior to trial had due diligence been exercised; it only corroborates previous testimony of the defendant that she had a "top secret" security clearance while working for the government, and thus is merely cumulative; and it relates to an immaterial issue largely irrelevant and not in dispute, and thus it is not probable that such evidence would lead to an acquittal on retrial.

■ Finally, the letter from the president of Dorner's to the defendant, explaining the defendant's job duties, fails to satisfy all four of the *Oliver* criteria. First, the letter, dated June 19, 1981, was in the possession of Colleen Nero more than nineteen months prior to trial and thus is not newly discovered evidence. Second, as the letter was in the possession of the defendant prior to trial, the exercise of due diligence would have allowed for its use in the trial. Third, the job description summary is cumulative. Charles Raether, the president of Dorner's, testified that Colleen Nero's duties consisted primarily of making sales calls on groups outside of the office, and stated on cross-examination that the defendant would not normally handle

traveler's checks. The job description is alleged to contradict Mr. Raether's testimony and corroborate the defendant's testimony concerning her access to traveler's checks while employed at Dorner's. We question whether the relevant paragraph of the job description even contradicts Mr. Raether's testimony, but to the extent it has any probative value, it is at best merely impeaching and cumulative.

Finally, the job description summary fails the fourth *Oliver* criteria as it is not probable that its introduction would lead to an acquittal on retrial. Although the defendant alleges that the job description indicates that she had access to traveler's checks while employed at Dorner's, its probative value is dubious. Only one paragraph of the five-page letter relates in any way to the defendant's access to traveler's checks while at Dorner's; the paragraph only reveals that on occasion the defendant may be required to perform travel agent duties.[6] The paragraph fails to mention traveler's checks, nor does it specify the duties a travel agent would perform or state whether the defendant ever performed those duties. Further, the government's evidence concerning the defendant's access to the traveler's checks rested primarily upon the testimony of Melinda Kidd, the Dorner employee responsible for the procedures utilized in traveler's checks sales. Ms. Kidd testified that the checks themselves were kept in sealed packages to avoid having any employee's fingerprints on them, that the defendant would not normally handle traveler's checks, and that Dorner's records indicate that she had never done so. Accordingly, we hold that it is not probable that the introduction of the job description letter would lead to an acquittal on retrial.

We have reviewed the "newly discovered evidence" on which the defendant based her motion for a new trial, and concluded

---

**6.** The paragraph in the job description letter which allegedly indicates that the defendant had access to traveler's checks while employed at Dorner's provides:

"Pending office workload, vacations, absentees, etc., will be expected to perform those duties necessary to assure smooth and efficient operation for the business. Such duties may include servicing walk-in customers, telephone requests, reservations, and overall functions of a travel agent."

that such evidence individually fails to meet the standards in *Larrison v. U.S.*, 24 F.2d 82 (7th Cir.1928) and *U.S. v. Oliver*, 683 F.2d 224 (7th Cir.1982). We also find that when considered as a whole, the "newly discovered evidence" fails to satisfy the essential criteria necessary to warrant a new trial. Even assuming the "newly discovered evidence" meets the other *Larrison* and *Oliver* requirements, we fail to see how the introduction of such evidence, in its entirety, either might cause a jury to reach a different conclusion under *Larrison*, or would probably lead to an acquittal under *Oliver*. We therefore hold that the district court did not abuse its discretion in denying the defendant's motion for a new trial.

## INEFFECTIVE ASSISTANCE OF COUNSEL

The defendant alleges for the first time on appeal that she was provided with ineffective assistance of counsel because her trial attorney failed to adequately investigate and present her case, allowed her to speak to FBI agents prior to her trial, and failed to move to suppress such statements at trial. It is well-established in this court that a litigant cannot present as grounds for reversal an issue not presented to the district court. *Holleman v. Duckworth*, 700 F.2d 391, 394–95 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983), *U.S. ex rel. Moore v. Brierton*, 560 F.2d 288, 291 (7th Cir.1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1285, 55 L.Ed.2d 794 (1978), *Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1333 (7th Cir.1977). Further, this court has specifically held that the issue of ineffectiveness of counsel, if not presented before the district court, will not be addressed on appeal:

> "The claims of incompetence of counsel and the voluntariness of the guilty plea are not properly before us for disposition. These issues were never presented to the district court and the factual basis for these claims was never part of the record before the district court."

*U.S. v. Gray*, 611 F.2d 194, 197 (7th Cir. 1979) (*citing U.S. v. Coronado*, 554 F.2d 166 (5th Cir.), *cert. denied*, 434 U.S. 870, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977)).[7]

Although a court on appeal may review an ineffectiveness of counsel claim which was not presented before the district court if the record is sufficiently developed with respect to such claim, *U.S. v. Phillips*, 664 F.2d 971, 1040 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982), we refuse to hold that such an exception is applicable to this case. No record is before us concerning the preparation of the defendant's trial counsel for this case, the extent of his participation in the defendant's discussion with FBI agents prior to the trial, or the possible tactical considerations which trial counsel may have had in failing to move to suppress such statements at trial. Without such evidence, it is impossible for us to rule on the ineffective assistance of counsel claim. Accordingly, due to the failure of the defendant to properly raise the ineffectiveness of counsel claim at the district court level and the absence of a sufficient record with respect to such claim, we decline to consider the issue here.[8]

7. *See also U.S. v. Rodriguez*, 582 F.2d 1015, 1016 (5th Cir.1978); *U.S. v. Stephens*, 609 F.2d 230, 234 (5th Cir.1980); *U.S. v. Hendricks*, 661 F.2d 38, 43 (5th Cir.1981); *U.S. v. Freeze*, 707 F.2d 132, 139 (5th Cir.1983); *U.S. v. Hill*, 688 F.2d 18, 21 (6th Cir.), *cert. denied*, 459 U.S. 1074, 103 S.Ct. 498, 74 L.Ed.2d 638 (1982); *U.S. v. Barham*, 666 F.2d 521, 524 (11th Cir.), *cert. denied*, 456 U.S. 947, 102 S.Ct. 2015, 72 L.Ed.2d 470 (1982), and *U.S. v. Griffin*, 699 F.2d 1102, 1107–09 (11th Cir.1983), in which other circuits have held that the issue of ineffective assistance of counsel can not be considered by the Court of Appeals on direct appeal where the claim was not raised before the district court. We note that these circuits have recognized that an adequate post-conviction procedure is afforded by 28 U.S.C. § 2255 for developing a factual record to support an ineffective assistance of counsel allegation, if such an allegation can be so supported.

8. Although the defendant's ineffectiveness of counsel claim is not properly before this court, we are skeptical of the merit of such a claim. In order to grant a new trial on the basis of ineffective assistance of counsel, the appellant must prove that the conduct on the part of trial counsel fell below the minimum standard of

**1208**

## CONCLUSION

We hold that the motion for a new trial on the basis of newly discovered evidence was properly denied and the defendant's convictions accordingly are affirmed.

professional representation guaranteed by the Constitution. *U.S. ex rel. Williams v. Twomey,* 510 F.2d 634, 641 (7th Cir.1975). The difficulty of showing such conduct has been well noted by this court:

> "Of course the mere fact that a lawyer makes errors in the course of a trial does not demonstrate failure to meet minimum professional standards. Minimum professional competence does not imply infallibility; nor are even the best lawyers infallible. But representation permeated by serious and inexplicable errors falls below minimum standards."

*Wade v. Franzen,* 678 F.2d 56, 58 (7th Cir.1982). The record before us presents no serious or inexplicable errors by trial counsel in the investigation or the presentation of the defendant's case which would fall below the minimum professional standard guaranteed by the Constitu-

tion. Accordingly, without other evidence, a new trial would not be granted.

In reference to the defendant's claim that trial counsel failed to move to suppress statements which she gave to the FBI prior to trial, we can conceive of no legitimate reason, nor has the defendant's counsel suggested any such reason beyond his bald assertion, which would preclude the admission of such evidence. Although, counsel suggests that the defendant was not "advised of her rights," it is clear that in her interviews with the FBI, the defendant was not entitled to a *Miranda* warning. In *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), the Supreme Court held that an individual who is not in custody at the time of an interview is not entitled to *Miranda* warnings prior to being questioned, and that statements given during such an interview are admissible at trial.